IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING

THOMAS ARTHUR WRIGHT,

         Plaintiff,

v.                                      **Civil Action No.: 5:10-CV-123**
                                      **JUDGE STAMP**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

         Defendant.

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT DENY DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [19], GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [15], AND REMAND WITH INSTRUCTIONS**

## I.  INTRODUCTION

On November 17, 2010, Plaintiff Thomas Arthur Wright ("Plaintiff"), by counsel Roger A.

Ritchie, Sr., Esq., filed a complaint in this Court to obtain judicial review of the final decision of

Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"),

pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint,

ECF No. 1)  On February 23, 2011, the Commissioner, by counsel Helen Campbell Altmeyer,

Assistant United States Attorney, filed an answer and the administrative record of the proceedings.

(Answer, ECF No. 8; Administrative Record, ECF Nos. 9-12)  On March 23, 2011, and April 20,

2011, the Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.

(Pl.'s Mot. for Summ. J., ECF No. 15; Def.'s Mot. for Summ. J., ECF No. 19)  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

A.    Procedural History

On June 15, 2007, the Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB"), alleging disability beginning April 18, 2007.  (R. at 63-65)  On July 13, 2007, the Plaintiff protectively filed a Title XVI claim for supplemental security income ("SSI"), alleging disability beginning April 18, 2007.  (R. at 590-93)  Both claims were initially denied on August 27, 2007, and denied again upon reconsideration on March 5, 2008.  (R. at 28, 29, 584, 589)  On April 7, 2008, the Plaintiff filed a written request for a hearing, which was held by video before United States Administrative Law Judge ("ALJ") Erin Wirth on February 26, 2009.  (R. at 29A, 619-58)  The Plaintiff, represented by Robert Guntharp, Esq., appeared in Hagerstown, MD, and the ALJ presided over the hearing from Richmond, VA.  (R. at 14)  Bonnie S. Martindale, an impartial vocational expert, also appeared at the hearing.  Id.  On August 4, 2009, the ALJ issued an unfavorable decision to the Plaintiff, finding that he was not disabled within the meaning of the Social Security Act.  (R. at 14-27)  On September 28, 2010, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 3-5)  The Plaintiff now requests judicial review of the ALJ's decision denying her application for disability.

B.    Personal History

Thomas Arthur Wright was born September 3, 1964, and was 43 years old at the time he filed his DIB and SSI claims.  (R. at 63)  He received his GED in 1981 and has special training in heating and air conditioning as well as confined rescue.  (R. at 141-42)  He is a veteran of the United States Army and has prior work experience as a stitching-machine operator, metal fabricator, and inventory clerk.  (R. at 110-11)  He is married and has two children. (R. at 64)

C.    Medical History

A nursing note, dated September 13, 1993, states that the Plaintiff was in an auto accident.  (R. at 406)  He was thrown from the vehicle and was unresponsive when responders first arrived.  Id.  Although a CT scan of the Plaintiff's head showed no intra or extraaxial fluid accumulation and X-Rays of the skull showed no evidence of a skull fracture, the Plaintiff suffered from a head trauma.  (R. at 419) X-Rays of the cervical spine showed good alignment.  (R. at 420)  X-Rays of the Plaintiff's left femur showed a fracture through the proximal third of the femoral shaft, with a second fractured located at the junction of the middle and distal third of the femoral shaft.  (R. at 421)  Despite the positive CT and X-Ray results, he did suffer from head trauma.  Id.

Following the car accident, the Plaintiff was transferred to the West Virginia Rehabilitation Center on October 18, 1993.  (R. at 478-79)  His intake diagnosis was a residual brain injury, possible seizure disorder associated with the brain injury, and a retinal tear of the right eye with vitreous hemorrhage.  (R. at 478)  Shortly after admission, he suffered from seizure-like episodes and was very agitated and hyperactive; he was placed on Dilantin, and his symptoms began to

improve.  Id.  He participated in therapy on a regular basis and made excellent progress, becoming ambulatory with a cane and fully independent in his activities of daily living.  (R. at 479)  He was discharged from the hospital unit to a dormitory on January 10, 1994, and formally discharged from the center on February 21, 1994.  (R. at 479, 480-81)  He was subsequently treated on various occasions by the center for his brain injury, vision problems, and a fractured leg.  (R. at 472-77)

An emergency department note from City Hospital shows that the Plaintiff visited the ER on August 2, 1998, complaining of lower back pain.  (R. at 399-400)  He stated that his pain began in the lower back and radiated down into his lower extremities.  (R. at 399)  He was prescribed ibuprofen and Soma, and instructed to use warm soaks and moist heating pads.  (R. at 400)  he was also instructed that he could only perform light duty work until August 6.  Id.

The Plaintiff was admitted to Washington County Hospital in Hagerstown, MD, on September 25, 1998, for a closed head injury following a motor vehicle collision.  (R. at 446-49) The accident is described in the physician's notes as a "head-on collision with massive car destruction" that left the Plaintiff unresponsive and caused him to have a seizure.  (R. at 447)  A CT scan revealed no abnormalities, and X-Rays of the lateral cervical spine showed no fractures or dislocations.  (R. at 448)  The Plaintiff did, however, have bone fractures in his medial malleolus, distal tibia, and anterior tibia at his left ankle joint.  (R. at 459)  He was discharged on September 28, 1998, with instructions to followup with outpatient speech therapy and followup on his seizures. (R. at 446)  An occupational therapy evaluation note from September 28, 1998, states that the Plaintiff had varying degrees of deficiency in his cognitive and memory functioning.  (R. at 464-65)

A diagnostic assessment completed on that date notes that the Plaintiff reported memory deficits and not doing well under stress; the evaluation showed that his orientation, recall, and reasoning were moderately impaired.  (R. at 469-70)

On July 16, 1999, the Plaintiff underwent an operation to remove a rod inserted into his leg after the car accident in 1993.  (R. at 431)  After the rod and screws were removed, a small amount of heterotopic bone was also removed.  Id.

A completion summary note from July 23, 1999, shows that the Plaintiff was treated with radiation following the removal of an intramedullary rod inserted into his femur after a motor vehicle accident.  (R. at 193-94)  The rod was removed due to recent pain in his leg, and radiation treatment was given to prevent heterotopic bone formation in the femur.  (R. at 193, 434)

A medical note from business health services at City Hospital, dated February 13, 2001, states that on February 12th the Plaintiff sustained a crush injury to his left index finger resulting in an open fracture of the distal phalanx of his left index finger.  (R. at 303)  His pain was recorded asa 5-6 on a scale of 10.  Id.  He was ordered to continue using pain medication and antibiotics and return for a followup on February 16.  Id.

On February 16, 2001, the Plaintiff visited City Hospital for a followup on his fractured left index finger.  (R. at 266)  He was no longer taking his Oxycodone and Keflex medications, and his pain had significantly improved, rating it at a 5-6 on a scale of 10.  (R. at 266, 298, 300)  He was cleared to return to light work with limited use of his left hand.  Id.  His finger was bandaged and splinted, and he was ordered to re-bandage with a wet saline dressing 4-5 times daily.  (R. at 300)

A progress note, dated February 23, 2001, from business health services at City Hospital

noted that the Plaintiff had only mild pain from his index finger fracture, rated as a 1-2 on a scale of 10. (R. at 294)

The Plaintiff visited Dr. Said on March 2, 2001 for a followup examination of an open fracture of the distal phalanx of his left index finger. (R. at 263) Dr. Said found the Plaintiff's finger to be healed, and found him fit to return to his regular duty. Id. A medical note from business health services at City Hospital, dated February 12, 2001, indicates that the Plaintiff's index finger wound was completely healed and that he had minimal pain, listed as 1-2 on a scale of 10. (R. at 293)

The Plaintiff visited the emergency room at City Hospital in Martinsburg, WV, on October 31, 2002, for chest pains. (R. at 287) He reported that he was moving cinder blocks into the back of his truck when he began feeling a sharp jabbing pain, which was clearly worse when he moved his arm or rotated his upper body. Id. A chest X-Ray was normal, and an EKG showed normal sinus rhythm Id. He was prescribed medication and discharged. Id.

The Plaintiff visited the Martinsburg VAMC as a new patient on November 7, 2002. (R. at 244-47) He complained of left hip pain due to a motor vehicle accident that made it hard to work because it hurt to stand or sit for extended periods. (R. at 244) The Plaintiff was oriented to person, place, and time. (R. at 246) He reported taking Aleve for pain, but his pain was worse when walking and nothing made it feel better. Id. A radiology report showed demineralization of the intramedullary portion of the distal left femur which may be caused by osteoporosis. (R. at 255) No evidence of arthritic changes of the left hip joint were found. Id.

On November 25, 2002, the Plaintiff underwent a full body bone scan, which came back

abnormal in the middle two-thirds of his left femur bone. (R. at 253) The abnormality was consistent with an old healed injury. Id. The rest of the skeleton was normal, and there was no evidence of metastatic disease involving the skeleton. Id.

On December 26, 2002, the Plaintiff was treated by Dr. Agarwal for pain in his left hip and knee. (R. at 232-34) The Plaintiff complained that his pain got worse after sitting for some time. (R. at 232) The Plaintiff was previously taking Naprosyn, which he said did not help; Dr. Agarwal instructed him to take Ibuprofen instead. (R. at 233) A radiology report from that date states that the Plaintiff has osteoporosis in the distal left femur but otherwise a normal left knee. (R. at 251) This was deemed a minor abnormality. Id.

A primary care physician note from June 30, 2003, states that the Plaintiff visited Dr. Agarwal for complaints of shoulder pain. (R. at 226-28) He was given a doctor's slip for work for not using his right arm. (R. at 227) A nursing note from that date states that the Plaintiff was able to walk without assistive aids. (R. at 229)

Dr. Larusso at City Hospital in Martinsburg, WV, treated the Plaintiff on May 26, 2006, for a headache. (R. at 280-81) The Plaintiff reported being hypoglycemic, and nearly left the hospital without treatment to go eat, but was seen shortly thereafter. (R. at 280) A CT scan was performed, which was read as negative, and a saline IV resolved the Plaintiff's headache. Id.

The Plaintiff visited the city hospital emergency room on April 18, 2007, complaining of left wrist and knee pain. (R. at 274-75) The Plaintiff was negative for any specific trauma to the knee or wrist, but Dr. Meske noted that the Plaintiff was working construction and that the Plaintiff felt he was spending a lot of time jumping and a lot of time on his knees. Id. He had no distal weakness,

numbness, or tingling, and no other joint aches or pains. (R. at 274) His knee showed some edema and small effusion, and his range of motion was intact albeit painful. Id. Dr. Meske diagnosed him with arthritis of the knee and wrist and probable osteoarthritis. Id. The Plaintiff's wrist and knee were splinted, he was prescribed medication, and ordered to apply heat four times daily. (R. at 275, 278) He was restricted to light duty work for seven days. (R. at 278)

An emergency room physician note from April 23, 2007, states that the Plaintiff was having knee pain aggravated by standing and walking. (R. at 222-23) The pain began while kneeling. (R. at 222) He reported 3-5/10 pain intensity while resting and 10/10 pain intensity while standing and moving. Id. The physician assessed his overall pain at 5/10. (R. at 223) A radiology diagnostic report from April 23 noted suprapatellar effusion, deformity due to an old healed fracture in the distal femur, and a normal knee joint. (R. at 250)

On May 16, 2007, the Plaintiff visited Dr. Declue for a recheck on his left knee, which he said was feeling a little bit better. (R. at 214-16) Dr. Declue ordered an MRI of his knee and advised him to ice it in the evenings, begin physical therapy, and take extra strength Tylenol. (R. at 215)

The Plaintiff visited Dr. Declue on June 1, 2007, complaining of ongoing knee and hip pain that was not getting better. (R. at 208-09) An MRI and physical therapy were scheduled, and additional medications were prescribed. (R. at 209) A nursing note from that visit indicates that the Plaintiff's pain goals had not been met and that the quality of his pain was worse lately. (R. at 211)

A consultation note dated June 15, 2007, from Dr. Kee states that the Plaintiff was having

pain, ranging in intensity from 6/10 to 9/10, in the area of his hip and knee. (R. at 201-02) The Plaintiff wanted to better control this pain, and Dr. Kee stated that this goal was met through the use of a TENS unit and a large moist heating pad. (R. at 202) The Plaintiff's pain was reduced down to 4/10 intensity and he requested a home program of pain management. (R. at 201-02) Also on June 15, the Plaintiff's left knee was examined by MRI, which found that the collateral ligaments were intact but there was moderate edema surrounding the MCL and significant edema within the musculo-tendonous junction. (R. at 248) An evaluation of the medial and lateral menisci failed to show definite evidence of a meniscal tear. Id. Dr. Jung, the interpreting physician, diagnosed the Plaintiff with moderate joint effusion and sprains of the popliteus muscle, popliteus tendon, and MCL. (R. at 249)

A physical therapy noted dated June 18, 2007, states that the Plaintiff was unable to come in for therapy because of his work schedule. (R. at 203) He requested to be discharged from the physical therapy clinic. Id.

The Plaintiff visited Dr. Declue on June 29, 2007, for a followup. (R. at 188-90) His left ankle pain was worse, but oxycodone was too strong. (R. at 189) He was getting relief from a TENS unit and heating pad. Id. An accompanying nursing note states that the Plaintiff reported his pain at being around a 5 on a scale of 10 (R. at 190-91)

Dr. Fleming took X-Rays of the Plaintiff's left ankle on June 29, 2007, and found the ankle to be normal. (R. at 178-79) A results letter dated July 2, 2007, from Dr. Declue states that the ankle should get better over time and that ice would help with the swelling. (R. at 187-88)

On July 16, 2007, the Plaintiff was prescribed an elastic knee brace by Dr. Downs at the

Martinsburg, VAMC.  (R. at 552)

On August 13, 2007, Dr. Pascasio, a state agency medical consultant, completed a physical residual functional capacity evaluation form, finding that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation.  (R. at 528)  The Plaintiff had occasional postural limitations in climbing/balancing/stooping/kneeling/crouching/crawling, but no manipulative, visual, or communicative limitations.  (R. at 529-31)  He could have unlimited exposure to wetness, humidity, noise, vibration, and fumes/odors/dusts/gases, but needed to avoid concentrated exposure to extreme cold/heat and hazards.  (R. at 531)  Dr. Pascasio only found the Plaintiff to be partially credible because some of his allegations were not supported by medical evidence.  (R. at 532)  Dr. Franyutti, in a case analysis note dated November 8, 2007, affirmed Dr. Pascasio's findings.  (R. at 523)

Also on August 13, 2007, Dr. Marinelli, a state agency psychological consultant, completed a psychiatric review technique form assessing the Plaintiff's mental impairments.  (R. at 535-48)  Dr. Marinelli found that the Plaintiff suffered from a an organic mental disorder, caused by a head injury with memory loss stemming from a 1993 motor vehicle accident.  (R. at 535-36)  Dr. Marinelli did not, however, find this impairment to be severe; he opined that the Plaintiff's impairment would only cause a mild degree of limitation in his activities of daily living, social functioning, and ability to maintain concentration, persistance, or pace.  (R. at 535, 545)  He found no episodes of decompensation, and found that the "C" criteria of Listing 12.02 were not met.  (R. at 545-46)  Dr. Marinelli found the Plaintiff's reports to be only partially credible.  (R. at 547)  A

case analysis note dated November 6, 2007, from Dr. Bartee affirmed Dr. Marinelli's findings. (R. at 524)

The Plaintiff visited Dr. Declue of the Martinsburg VAMC on September 7, 2007, for an evaluation of his medical conditions, including pain in his ankle/foot, knee injury, memory loss, head trauma, hip and thigh injury, double vision, and joint pain. (R. at 180-84) The Plaintiff reported that his condition was worsening; he was having double vision, constant pain in his left hip and right knee, and he was waking up at night due to pain. (R. at 181) He appeared thinner than at his last appointment, but with good hygiene. (R. at 183) He was ambulating with a cane and had a knee brace. Id. His gait was normal, but he had pain on the left side, with joint pain in the ankle, foot, and hip. Id. He was uncomfortable sitting down. Id. An accompanying nursing note (R. at 184-87) states that the Plaintiff reported dull, achy pain in his knees and joints of a variable duration. (R. at 186)

Images taken of the Plaintiff's hip on September 7, 2007, by Dr. Jung showed evidence of a previous proximal femoral fracture and evidence of a previous intramedullary rod in the femoral shaft, but otherwise the hip joint appeared unremarkable. (R. at 178)

The Plaintiff visited Dr. Jones at Shenandoah Community Health Center on November 15, 2007, for hypoglycemia and arthritis. (R. at 150-51) The Plaintiff had moderate, chronic left hip and left knee pain, and was prescribed Tramadol for pain control. (R. at 150-51) Dr. Jones noted that, although the Plaintiff has a history of a traumatic brain injury from a motor vehicle accident, his brain injury is stable: "[o]ld issue. He is stable at this point. No known ongoing problems." (R. at 151) His hypoglycemia was stable. (R. at 151)

The Plaintiff visited Dr. DeLanoy at Shenandoah Community Health Center on December 14, 2007. (R. at 152-54) The Plaintiff reported that his hip and knee pain was going down hill, and that his pain prescription was making him depressed. (R. at 152) He reported that his moods were normal, and his hypoglycemia would go away if he ate or drank something. Id. He reported a moderately active life, but Dr. DeLanoy noted he used a cane and a knee brace. (R. at 152-53) The Plaintiff's right hip and knee did not display joint deformity, heat, swelling, erythema, or effusion, and both had a full range of motion. (R. at 153) However, upon motion, the hip caused severe pain and the knee caused moderate pain. Id. The left knee had pain along the joint line but no joint laxity. Id. Dr. DeLanoy found that the Plaintiff's brain injury was stable, that his osteoarthritis was chronic and may need referral to an orthopedist for injection, and that his hypoglycemia was stable. (R. at 154)

On December 15, 2007, the Plaintiff was examined by Dr. Tuwiner, a state agency medical examiner, in Hagerstown, MD, for a disability determination examination. (R. at 515-21) Dr. Tuwiner diagnosed the Plaintiff with arthritis in the left hip and knee, as well as cognitive impairment due to a closed head injury. (R. at 517) The Plaintiff's gait was antalgic, favoring the right leg. (R. at 516) His range of motion was normal, but he experienced severe pain in his left hip and knee with internal and external rotation of his right hip. (R. at 516-17) The Plaintiff's hip problem needed to be further explored with an MRI, but his knee problems was considered severe. (R. at 517) Dr. Tuwiner opined that the Plaintiff's knee and hip may require surgery. Id. Dr. Tuwiner believed that the Plaintiff could sit without limitation, but due to his gait dysfunction and arthritis he could only stand or walk for 2-4 hours in an 8-hour workday. (R. at 518) He required

an assistive device for mobility, and has occasional postural limitations in bending, stooping, and crouching.  Id.  Frequent postural activities may predispose the Plaintiff to fall.  Id.  He could lift 10 pounds occasionally, and 5 pounds frequently, but if the Plaintiff lifted anything above this range he would be susceptible to a fall or might exacerbate his knee and hip arthritis.  Id.  Additionally, he has possible cognitive impairments that might impact his ability to work, but those impairments needed to be assessed by way of a neuropsychological consult.  (R. at 517-18)

Right knee X-Rays taken on January 16, 2008, by Dr. Jung of City Hospital Radiology Services showed that the knee was anatomically aligned, the joint spaces were preserved, there were no fractures or erosions, and that the images were "unremarkable."  (R. at 174)

On January 14, 2008, the Plaintiff visited Dr. DeLanoy for a followup on his knee pain, reporting that since his last visit his pain had progressed to where he could not walk and he was staying in bed.  (R. at 155-56)  He reported that his left knee and hip were still painful, and that 2 weeks earlier his right knee also started hurting.  (R. at 155)  He also reported that sometimes he uses two canes.  Id.  Dr. DeLanoy noted tenderness in both knees and moderate pain with motion. (R. at 156)

The Plaintiff underwent a neuropsychological screening on January 28, 2008, conducted by Dr. Kradel, a psychologist in Martinsburg, WV.  (R. at 511-14)  Dr. Kradel conducted a clinical interview and administered the following psychologic tests:  MSE, WAIS-III, WRAT-3, COGNISTAT.  (R. at 511)  Dr. Kradel diagnosed the Plaintiff with an adjustment disorder with mixed anxiety and depressed mood, chronic, with a poor to fair prognosis.  (R. at 514)

Dr. Franyutti, a state agency medical consultant, completed a physical residual functional

capacity form on February 28, 2008. (R. at 503-10) Dr. Franyutti found that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk for 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation. (R. at 504) He could occasionally climb ramps/stairs, balance, and stoop, and never climb ladders/ropes/scaffolds, kneel, crouch, or crawl. (R. at 505) He had no manipulative, visual, or communicative limitations. (R. at 506-07) He could have unlimited exposure to extreme heat, wetness, humidity, noise, fumes/odors/dusts/gasses, but needed to avoid concentrated exposure to extreme cold and vibration and avoid even moderate exposure to hazards. (R. at 507) Dr. Franyutti found the Plaintiff to be credible as to his alleged symptoms. (R. at 508)

On March 4, 2008, Dr. Bartee, a state psychological consultant, completed a psychiatric review technique assessment of the Plaintiff's mental impairments. (R. at 489-502) Dr. Bartee found that the Plaintiff suffered from a an adjustment disorder causing mixed symptoms of anxiety and depression, but found that this disorder was not a severe impairment. (R. at 489, 492, 494) The Plaintiff's impairments caused only a mild degree of limitation in his activities of daily living, his ability to maintain social functioning, and his concentration, persistence, or pace. (R. at 499) No episodes of decompensation of an extended duration were noted. Id. Evidence in the file did not establish the presence of the "C" criteria of the listings. (R. at 500) Dr. Bartee concluded that the Plaintiff's limitations were primarily attributed to the effects of pain, that his IQ was average and the Cognistat showed nothing significant, and the medical evidence did not indicate a severe impairment that meets a listing. (R. at 501)

On April 14, 2008, the Plaintiff visited Dr. Yellott at Shenandoah Community Health Center

for left hip pain. (R. at 157-58) The Plaintiff was positive for psychiatric symptoms and sleep disturbances, but negative for anxiety. (R. at 157) He was oriented to time, place, person, and situation; however, he was "affected," kept his eyes closed while talking, and was positive for anhedonia and mood swings. (R. at 158) His attention span and concentration were normal, he did not have pressured speech, and did not have suicidal ideation. Id. He wore braces on his knees, and moved slowly with a cane. Id. Dr. Yellott diagnosed him with chronic osteoarthritis post trauma to a motor vehicle accident and uncontrolled depression. Id.

The Plaintiff visited Dr. Delanoy on June 11, 2008, for a refill of his medications and to seek a referral for hip and knee replacement surgery. (R. at 159-61) Dr. Delanoy noted moderate pain with motion of his knees and hip, but the knee tests performed (Ecchymosis, Atrophy, Laxity, Meniscal) were all negative. (R. at 160-61) Dr. DeLanoy referred the Plaintiff to Dr. Knutson for possible orthopedic surgery. (See R. at 161)

Dr. Draper evaluated the Plaintiff on July 9, 2008, for complaints of whole body pain. (R. at 172) The Plaintiff reported being in an automobile accident 16 months earlier and that he has had pain all over his body since then. Id. The Plaintiff narrowed down his pain to his knees and his left hip, and Dr. Draper believed most of his pain to be in his left knee. Id. The Plaintiff reported that he could not kneel and was bothered by prolonged walking, sitting, or standing. Id. Dr. Draper's physical exam notes stated that the Plaintiff's pain did not seem to be terrible, but that he did move stiffly. Id. He also had decreased internal rotation and some discomfort and tenderness in his left hip. Id. His left knee exhibited popping and crepitus, lateral joint line tenderness, and a bit of effusion, but both knees were stable to various stresses. Id. Dr. Draper recommended arthroscopic

surgery if the Plaintiff's left knee continued to bother him.  Id.

On August 4, 2008, the Plaintiff underwent arthroscopy of his left knee, performed by Dr. Draper at City Hospital.  (R. at 176-77)  Dr. Draper located a tear in the posterior half of the lateral meniscus, which was repaired by removing the torn part of the meniscus.  (R. at 176)

The Plaintiff visited Dr. DeLanoy on September 5, 2008, following arthroscopic knee surgery, complaining of hip pain and tobacco addiction.  (R. at 162-64)  Dr. DeLanoy noted that the Plaintiff wore a brace on his right knee.  (R. at 163)  The Plaintiff was advised to continue taking Ibuprofen and Ultram for osteoarthritis pain, and start Chantix for smoking cessation.  (R. at 164)  His previous brain injury was noted as stable.  Id.

Dr. Draper wrote on October 9, 2008, that the Plaintiff's left knee was doing better, but that the pain in his hip began to spread to his groin and down his left leg and he was experiencing a lot of back pain.  (R. at 171)  Dr. Draper recommended a CT of the Plaintiff's lower back and continued physical therapy.  Id.

A CT scan report dated October 17, 2008, by Dr. Blanco of City Hospital Radiology Services noted a mild disc bulge at L3-4 and a tiny posterior protrusion at L4-5, but unremarkable or normal findings in all other respects.  (R. at 173)

A chart update from Dr. DeLanoy on October 21, 2008, noted that the Plaintiff had a head injury not otherwise specified and osteoarthritis as chronic conditions, and that he was currently taking Chantix, Ibuprofen, and Ultram.  (R. at 165)

Dr. Draper reviewed the Plaintiff's CT scan results on November 18, 2008, finding a lumbar strain.  (R. at 171)  The Plaintiff still had decreased motion in the left hip, but his knee had improved

to where it only bothered him going up and down stairs.  Id.

On December 4, 2008, the Plaintiff visited Dr. DeLanoy for a followup on his osteoarthritis and tobacco addiction.  (R. at 167-68)  The Plaintiff reported that his pain was mostly in his left hip, but he also had some lower back pain.  (R. at 167)  He had tenderness in both hips, with moderate pain on motion.  (R. at 168)  Dr. DeLanoy prescribed Lortab to help with pain because the Plaintiff reported that Ultram was not working.  (R. at 167-68)

Dr. DeLanoy submitted a physical residual functional capacity questionnaire on February 3, 2009, stating that the Plaintiff is not a malingerer, that pain and other symptoms would constantly interfere with his attention and concentration, and that he is incapable of even "low stress" jobs.  (R. at 604-08)  Dr. DeLanoy did not answer the majority of the questions on the form, stating that the answer was unknown to questions such as the amount of time the Plaintiff can walk or sit, how much he can lift, and his postural or manipulative limitations.  (See R. at 605-07)

Gerald Wells, Ph.D, a vocational consultant, submitted a vocational evaluation of the Plaintiff on February 15, 2009.  (R. at 195-99)  Mr. Wells's report is based upon an interview conducted on January 23, 2009, as well as a review of the Plaintiff's medical information.  (R. at 195)  Mr. Wells noted that on September 13, 1993, the Plaintiff was involved in a motor vehicle accident that resulted in a head injury and fractures to his left femur and right scapula.  (R. at 196) On September 25, 1998, he was involved in a second motor vehicle accident, resulting in a second closed head injury.  (R. at 197)  The Plaintiff informed Mr. Wells that the pain in his hip and leg is constant in any position, is of a throbbing, sharp quality, and ranges from an 8-10 on a 10-point scale of intensity.  (R. at 198)  The Plaintiff estimated for Mr. Wells that he could walk about 25 feet, that

he can stand about 5 minutes before he has to sit, that he can only stand for about an hour total in an 8-hour day, that he can only lift 4-5 pounds, and that he can only sit about 30 minutes at a time. Id. Mr. Wells opined that the Plaintiff would not be able to perform even sedentary work because his pain causes him to be unable to perform even low stress jobs. (R. at 199) Mr Wells further opined that he believed the Plaintiff to be totally disabled from any kind of work. Id.

On February 19, 2009, Dr. Draper completed a physical residual functional capacity questionnaire. (R. at 145-49) Dr. Draper diagnosed the Plaintiff with left shoulder impingement, left hip inflammation, left knee arthritis, left ankle arthritis, and a closed head injury with residual memory and cognitive function loss. (R. at 145) He stated that these conditions cause headaches, memory problems, pain, and limitation of motion in multiple joints; the associated pain is aggravated by cold, damp weather and by activity. Id. His findings are objectively shown by X-Rays, arthroscopic findings in the knee, crepitance, and loss of motion in the Plaintiff's joints. Additionally, the Plaintiff suffers from depression and a personality disorder. (R. at 146) Dr. Draper opined that the Plaintiff's pain and other symptoms would frequently interfere with his attention and concentration. Id. He opined that the Plaintiff could sit or stand for less than 2 hours in an 8-hour workday. (R. at 147) He stated that the Plaintiff told him that he would need to walk every 15 minutes for 10 minutes at a time and would need to take unscheduled breaks every 30 minutes for 10-15 minutes at a time. Id. The Plaintiff could occasionally lift less than 10 pounds, rarely lift 10 pounds, and never lift more than 10 pounds. Id. He could occasionally look down, turn head right or left, and look up. (R. at 148) He could never twist, stoop, crouch/squat, or climb ladders, and could only rarely climb stairs. Id. His hand functioning is normal. Id. Dr. Draper

further opined that temperature and humidity would cause the Plaintiff to have "good days" and "bad days," and on average he would likely miss more than four days of work per month due to his impairments.  Id.

E.    Testimonial Evidence

At the ALJ hearing held on February 26, 2009, the Plaintiff testified that was 44 years old, married, and lives with his wife, his three children, and his granddaughter.  (R. at 626, 628)  He completed the ninth grade prior to joining the Army Reserves and then completed his high school diploma upon joining the Army.  (R. at 628)  He can read, write, and do simple math, but does not like to read.  (R. at 628-29)  He stated that he has trouble reading things close up due to double vision, caused by a car accident in 1993.  (R. at 638-39)  To read things up close, he must close one eye.  (R. at 638)

The Plaintiff testified that he used to work for his brother's company, Tim Wright Welding, as a mechanical contractor.  (R. at 630)  His job mostly entailed painting fabricated metal, but also included some steel cutting and grinding.  (R. at 631)  He was working ten-hour days, four days per week, but stopped working in April 2007 due to problems with his knees and hips.  (R. at 630-31)  While working, he was allowed to take breaks whenever he wanted to, and was allowed to sit down whenever he wanted.  (R. at 642)  He stopped working after he injured his left knee while kneeling down on some metal grating.  (R. at 632)  He did not have surgery at that time, but did undergo arthroscopic surgery a year later.  Id.  Prior to working at Tim Wright Welding, the Plaintiff worked as a forklift driver for a construction company, delivering parts to different job sites.  (R. at 650-51)

After injuring his knee, the Plaintiff stopped working and filed for unemployment.  (R. at

632) He stated that he did not seek employment after quitting his brother's company; however, the ALJ expressed concern over a doctor's note, dated June 18, 2007, which states that the Plaintiff could not make his appointment due to his work schedule. (R. at 633, 639) Although the ALJ conceded that in some instances medical records will simply copy over information from previous visits, the statement was specific in the date and information, and the Plaintiff had testified that he had filed for unemployment at the time of the appointment. (R. at 640)

The Plaintiff was originally injured in an accident in 1993, after which he received Social Security disability payments until returning to work. (R. at 633)

The Plaintiff lives in a house, but sleeps on the couch. (R. at 633-34) His wife sleeps in the upstairs bedroom. (R. at 634) On a typical day, he wakes up, drinks some coffee, takes his medication, and then watches television. (R. at 634) He smokes, so he occasionally gets up, walks outside, and smokes by the door. (R. at 634-35) He has not mowed the lawn or done and kind of yard work for two years. (R. at 635) He has a driver's license and can drive, but does not drive for long distances, restricting himself to only 5-10 mile trips. Id. He does not do any housework, such as sweeping or mopping, and does not help with the dishes or preparation of meals. (R. at 635-36) He does not have any hobbies or do any activities. (R. at 636)

The ALJ asked the Plaintiff if he could perform a job where he could sit down for most of the day and stand up whenever he needed to, such as a job sitting at the front desk of an office building. (R. at 636) The Plaintiff replied that he could not perform such a job because he has pain all the time and he is always changing position from sitting and standing. Id. He only takes over-the-counter Ibuprofen for pain, and he stated that it does not help him very much. (R. at 637) He

was prescribed hydrocortisone, but he cannot afford to purchase the medication. (R. at 637-38)

The Plaintiff has vision problems due to double vision, which is worse at close range. (R. at 638) The Plaintiff testified that the monitor at the hearing, located roughly 8 feet away, was doubled, but that objects farther away were normal. Id. He also testified that he could not read the papers in front of him with both eyes open; he would have to close one eye to eliminate the double vision and then read the papers. Id. He has prisms in his glasses, but he claims that his eyesight is getting blurrier over time. (R. at 639) His vision problems began in 1993 after the car accident. Id.

The Plaintiff testified that he cannot lift 10 pounds, cannot walk for two hours during an eight-hour period, cannot sit for six hours in an eight-hour period, cannot twist his body, cannot stoop or crouch, cannot climb ladders, and has difficulty climbing stairs. (R. at 641) He has to use a cane while walking due to balance problems and has fallen in the past, including a fall that occurred about two weeks before the ALJ hearing. (R. at 643-44)

The Plaintiff has pain all of the time, and his pain interferes with his concentration. (R. at 641-42) He testified that he was in pain while giving his testimony at the hearing. (R. at 642) He can stand for less than ten minutes before he must sit down due to pain. (R. at 643) There are some days where his pain is worse than others, and extremes of temperature and changes in the weather bother him. Id.

The Plaintiff has trouble sleeping, getting only four to six hours of sleep per night and only in two to three hour intervals. (R. at 644-45)

The Plaintiff testified that he has problems remembering things, and that his family members

have gotten frustrated with him because he forgets things.  (R. at 645)

The Plaintiff cannot handle stressful situations, getting upset and loud whenever he feels pressured.  (R. at 646)  He gets stressed by loud noises, which bother him due to his hearing problems.  Id.  The Plaintiff's wife is in the process of divorcing him because he has gotten meaner toward the kids and he has stopped helping out around the house.  (R. at 647)

Also testifying at the ALJ hearing on the Plaintiff's behalf was his daughter, Ashley Nicole Wright, who stated that the Plaintiff did not work after April 2007 and that he does not do any of the cooking, cleaning, or grocery shopping.  (R. at 656)

F.      Vocational Evidence

Bonnie Martindale, an impartial vocational expert, also appeared and testified at the ALJ hearing on February 26, 2009.  (R. at 648-50, 651-55)  After clarifying the Plaintiff's past relevant work as a construction worker and fabrication welder, Ms. Martindale testified that the Plaintiff's work as a forklift operator was medium, semi-skilled; his work as a fabricator was heavy, skilled; his work as a welder was heavy, skilled; and his bindery work was medium, semi-skilled.  (R. at 652)  His past relevant work skills were not transferrable.  Id.  The ALJ then posed a series of hypotheticals to Ms. Martindale:

> Q.      For this first hypothetical, this person is limited to sedentary work, so let's see him carrying 10 pounds at most, standing and walking for two hours out of an eight-hour day, and sitting for six hours out of an eight-hour day.  The person is further limited to only occasion [sic] climbing, bending, balancing, stooping, kneeling, crouching, or crawling, only occasional exposure to extreme heat or cold, no hazardous machinery, one hand would need to be available to use a cane for walking, would need a sit/stand option, no climbing ropes or ladders.  You're looking for an SPV: 3 or less, and an environment where there was not regularly unexpected loud noises.  If those

were the only limitations, would that person be able to return to the Claimant's past work?

A.     No, Your Honor. He did no sedentary work.

Q.     Would there be other jobs that would fit with those limitations?

A.     Let me take a look and see what I have. I use (INAUDIBLE) statistics. And the types of jobs I would identify, Your Honor, would be sedentary jobs, SPV: 3 or less. Now, the sit/stand option is not identified in the <u>DOT.</u> But the type of environment that I would identify for that type of environment would be office work, where someone would have more flexible [sic] within the environment to stand briefly or sit when they need to, and there would be no hazardous machine. There would be no regulated temperatures. There would be no ropes or ladders to climb, and there would be no loud noises. And the (INAUDIBLE) there's generally none. And the types of jobs I would identify would be – see what I have here – sedentary capacity would be an interviewer, such as a Sedentary II Charge Account Clerk. Nationally, there's 35,000. Now, we're doing Maryland today, and I don't know if Mr. Wright's domicile is in Maryland or West Virginia.

Q.     He's a West Virginia resident.

A.     Okay. I will give you both. West Virginia, almost 300, Maryland almost 600 Charge Account Clerk. Also, Your Honor, I would look Telephone Clerk, which is help clerk giving information over the telephone, sedentary too, nationally 80,000, West Virginia 300, Maryland 1900. Also, Your Honor, on a sedentary capacity for office work, such as a Document Preparer, is 126,000 nationally, 900 in West Virginia, and 2700 in Maryland. Those are the type of jobs I would identify for that hypothetical.

Q.     All right. What type of reading would be required if he takes these jobs?

A.     At a SPV: 2, it would take some reading at a lower level. SPV: 2 is unskilled, so it would at least take sixth grade reading level.

Q.     Would it – I'm curious more about the frequency, and I don't know if you have information about that or not?

A.     I do not, not specific. They would have to know how to read because they're either taking information or giving information. Even though it's unskilled

they have to have a potential for reading.

Q.       If somebody can – this is a (INAUDIBLE) hypothetical – if somebody can sit, sit or stand for no longer than 10 minutes, or has trouble paying attention to tasks due to pain, and misses work on a regular basis, is that going to impact their ability to work?

A.       Yes, Your Honor. My absenteeism rate, even though you didn't identify it in a specific number is one and a half to two days per month. But if an individual is missing more than that, they are generally let go. The pain, if it's mild, is generally tolerated. but if it's severe, then it's not. And if somebody not staying at task for more than 10 minutes at a time, that will also be (INAUDIBLE) quality (INAUDIBLE) performance during the job.

Q.       Do you think that would, I mean, that they couldn't find work?

A.       I think they couldn't find work. That's correct.

(R. at 652-54)

G.       <u>Lifestyle Evidence</u>

On an Adult Function Report dated August 1, 2007, the Plaintiff stated that he will get up around 3:00 AM or 5:00 AM, then go back to sleep and wake up around 10:00 AM. (R. at 124) If he goes in to town or has an active day he sleeps better. <u>Id.</u> He helps out with chores when he can, such as cleaning out his cat's litter box, but his wife helps about 50% of the time. (R. at 125) He will mow once in awhile when his wife motivates him to, and will shop once a week at the local convenience store for milk. (R. at 126-27) He spends lots of time watching television and prefers to keep to himself. (R. at 128-29) On a subsequent report, dated September 26, 2007, the Plaintiff stated that he lays around, sleeps a lot more, and doesn't do much because he gets tired and sore very easily. (R. at 107)

On a daily activities questionnaire dated July 12, 2008, the Plaintiff stated that he does some

laundry once a week, drives about 30 miles per month, visits his mother about 2-3 times a week and visits other family members once a week, and can use public transportation.  (R. at 66-70)

### III.  CONTENTIONS OF THE PARTIES

The Plaintiff, in his motion for summary judgment,[1] alleges that:

•    the conclusions and findings of fact of the Defendant were not supported by substantial evidence and are contrary to law and regulation;

•    the Defendant failed to meet the burden of proof;

•    the Defendant failed to apply correct legal standards;

•    the Plaintiff's entitlement is clear from the record; and

•    the Plaintiff's impairments meet a listing.

(Pl.'s Mot. for Summ. J. 1, ECF No. 15)  Specifically, the Plaintiff alleges in his accompanying memorandum that:

•    the ALJ's RFC determination is erroneous because it failed to account for the opinions of Drs. Draper and Delanoy;

•    the ALJ erroneously afforded greater weight to the testimony of a consultative examiner; and

•    the ALJ failed to consider the vocational evaluation of Gerald Wells, Ph.D.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. 8-14, ECF No. 16)  The Plaintiff requests that the Court reverse the decision of the Commissioner and award benefits.  (Pl.'s Mot. for Summ. J. 2, ECF No.

---

[1] The Plaintiff's motion for summary judgment requested oral argument on his motion. (Pl.'s Mot. for Summ. J. 2)  The undersigned finds that oral argument is unnecessary in this case as the record is complete and the parties have fully briefed the issues.

15)

In contrast, the Defendant alleges in his motion for summary judgment that the decision

denying the Plaintiff's claims is supported by substantial evidence and should be affirmed as a

matter of law.  (Def.'s Mot for Summ J.1, ECF No. 19)  The Defendant argues that:

•       the ALJ included all credible limitations in his RFC findings

•       substantial evidence supports the weight given to Dr. Tuwiner's opinion; and

•       the ALJ properly rejected the vocational opinion of Gerald Wells.

(Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. 12-17, ECF No. 20)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in

a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to
> determining whether the findings . . . are supported by substantial evidence and
> whether the correct law was applied.  See 42 U.S.C. § 405(g) ( "The findings . . . as
> to any fact, if supported by substantial evidence, shall be conclusive . . . .");
> Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v.
> Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial
> evidence" means "such relevant evidence as a reasonable person might accept as
> adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401, 91 S. Ct.
> at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206,
> 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the
> case before a jury, then there is "substantial evidence."  Laws v. Celebrezze, 368
> F.2d 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court
> to determine the weight of the evidence, nor is it the court's function to substitute its
> judgment . . . if the decision is supported by substantial evidence.  See  Laws v.
> Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Because review is limited to whether there

is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the

case <u>de novo</u> when reviewing disability determinations." <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** <u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.    <u>Standard for Disability and the Five-Step Evaluation Process</u>

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

<u>See</u> 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

B.    The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.    **The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.** (R. at 16)

2.    **The claimant has not engaged in substantial gainful activity since April 18, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).** (R. at 16)

3.    **The claimant has the following severe impairments: osteoarthritis, detached retina with laser corrective surgery, closed head injury, adjustment disorder with mixed anxiety and depression, elbow bursitis, and fractured left femur with open reduction internal fixation and residual hip and leg pain (20 CFR 404.1520(c) and 416.920(c)).** (R. at 16)

4.    **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR**

**404.1525, 404.1526, 416.925 and 416.926).** (R. at 17)

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is limited to jobs with occasional climbing, bending, balancing, stooping, kneeling, crouching, crawling, and exposure to extreme heat or cold. The claimant can not climb ropes or ladders and is limited to jobs that do not involve hazardous machinery. Mr. Wright must have one hand available for walking with a cane and must have the option to sit or stand. Additionally, the claimant is limited to jobs with no unexpected loud noises. Due [to] his nonexertional limitations the claimant is limited to jobs with a specific vocational preparation of 3 or less (unskilled work). (R. at 18-19)

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965). (R. at 25)

7.      The claimant was born on September 3, 1964 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563 and 416.963). (R. at 25)

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964). (R. at 26)

9.      Based on vocational expert testimony, the claimant's acquired skills are not transferable to other work (20 CFR 404.1564). (R. at 23)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a). (R. at 26)

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 18, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)). (R. at 27)

C.      The ALJ Failed To Explain The Weight Afforded To The Opinions Of The Plaintiff's Treating Physicians

The Plaintiff's first assignment of error is that the ALJ was required to explain the weight

afforded to the opinions of his treating physicians, Dr. Draper and Dr. Delanoy. (Pl.'s Mem. in Supp of His Mot. for Summ. J. 10, ECF No. 16) The Plaintiff argues that the ALJ failed to explain why Dr. Draper and Dr. Delanoy's opinions were not assigned controlling weight, and thus failed to support the RFC portion of her decision with substantial evidence. Id. The undersigned Magistrate Judge agrees, finding that the ALJ was required to explain in the notice of determination or decision the weight afforded to the opinions of the Plaintiff's treating physicians and the reasons for that weight but failed to do so.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 1527(a)(2); 20 C.F.R. § 416.927(a)(2). "We will always give good reasons **in our notice of determination or decision** for the weight we give your treating source's opinion." 20 C.F.R. § 1527(d)(2); 20 C.F.R. § 416.927(d)(2).

In this case, the ALJ provided a detailed discussion of the Plaintiff's medical records, including the medical records of Dr. Delanoy and Dr. Draper. (See R. at 20-24) However, the ALJ did not discuss the opinions offered by these physicians for this case,[2] and thus the undersigned is unable to determine the weight assigned to those opinions and the reasons for that weight.[3]

---

[2] The opinions referenced by the Plaintiff are physical residual functional capacity questionnaires submitted by Dr. Delanoy on February 3, 2009, and by Dr. Draper on February 19, 2009. (See R. at 604-08; R. at 614-18)

[3] The ALJ did state that "[t]hese objective findings of the claimant's treating examiners do not support the severity of limitations that he has alleged." (R. at 24) However, this statement is clearly an explanation of the ALJ's findings on the Plaintiff's credibility, and the

Considering that the ALJ is specifically required by the regulations to give such an explanation in the notice of determination or decision, the undersigned Magistrate Judge finds that the ALJ failed to support her RFC assessment with substantial evidence. Accordingly, the undersigned Magistrate Judge recommends that this case be remanded to the Social Security Administration, with instructions to clarify the Commissioner's RFC assessment by providing an appropriate explanation of the weight afforded to the opinion evidence submitted by the Plaintiff's physicians.[4]

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that the Defendant's Motion for Summary Judgment (ECF No. 19) be **DENIED** and the Plaintiff's Motion for Summary Judgment (ECF No. 15) be **GRANTED IN PART** by reversing the Secretary's decision under sentence four of 42 U.S.C. § 405(g), with remand of the matter to the Secretary for further proceedings consistent with

---

section of the opinion dealing specifically with opinion evidence mentions only the weight afforded to the opinions of the State agency consultants. (See R. at 25)

[4] The undersigned also notes that the Plaintiff objected to the ALJ's failure to consider the opinion of Dr. Gerald Wells, a certified rehabilitation counselor who submitted a vocational analysis of the Plaintiff's ability to maintain work. (Pl.'s Mem. in Supp. of His Mot. for Summ. J. 12-13) Dr. Wells, as a certified rehabilitation counselor, is not an "acceptable medical source," and thus his opinion is not a medical opinion within the meaning of the regulations. See 20 C.F.R. § 404.1513(a) (listing acceptable medical sources); 20 C.F.R. § 416.913(a) (same); see also 20 C.F.R. § 404.1527(a)(2) (stating that medical opinions are statements from "acceptable medical sources"); 20 C.F.R. § 416.927(a)(2) (same). However, upon remand, the undersigned Magistrate Judge recommends that the ALJ consider Dr. Wells's opinion according to the requirements set forth in Social Security Ruling 06-03P and give some indication in her notice of determination or decision as to the weight afforded to that opinion. See SSR 06-03P, 2006 WL 2329939 (August 9, 2006).

this Report and Recommendation.  I **FURTHER RECOMMEND** that, on remand, the Secretary be directed to clarify his findings as to the Plaintiff's residual functional capacity by explaining the weight afforded to the opinion evidence submitted in this case.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **9th** day of **June**, **2011**.


_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE